## GEE v. OLSON.

1. Appeal and Error—Questions Reviewable—Termination of Contract of Employment—Justification.

Whether or not defendant die makers who employed plaintiff on a commission basis were justified in terminating his employment as a sales engineer because he did not work exclusively for them is not determined where written contract gave defendants the absolute right to terminate his employment, even arbitrarily.

2. Same—Construction of Contract—Commissions.

On appeal from judgment in assumpsit as to amount of commissions due plaintiff sales engineer under written contract for services rendered defendant die makers, Supreme Court must make its determination on the construction it makes of the contract and agreements between the parties.

3. CONTRACTS—COMMISSIONS—RENEGOTIATIONS.

Where plaintiff sales engineer's contract of employment with defendant die makers for 1942 did not contain a provision for adjustment ·of commissions to a renegotiated price basis, defendants could recover nothing on their cross declaration in assumpsit action for overpayment of commissions for that period (50 USCA, App. § 1191).

4. SAME—COMMISSIONS—RENEGOTIATIONS.

In action of assumpsit to recover balance due for commissions on business procured for defendant die makers by plaintiff as sales engineer under contracts of employment for 1943 and 1944 wherein adjustments were permissible for reductions of sales prices due to action taken by the United States government, finding of trial judge that plaintiff was not bound to adjust his commissions on a basis of renegotiated prices *held,* proper, where it appears (1) that plaintiff was not consulted in making the renegotiations, (2) defendants' books did not disclose any item of debit against plaintiff for refunds of' commissions, (3) no amount was actually refunded for such years, (4) renegotiations agreed on·were for lump sums and included other contracts than those procured by plaintiff without specifying amount of reduction for any particular contract, and (5) defendants represented to the government that plaintiff's commissions were correct and they received full credit for his commissions based on original prices (50 USCA, App. § 1191).

5. SAME—COMMISSIONS—CANCELLATIONS—RENEWALS.

Under plaintiff sales engineer's contract of employment with defendant die makers for commissions based on net business procured and providing for services in a technical and administrative capacity *held,* not entitled to commissions on orders which stood as cancelled as of date contract was terminated even though later they were renewed and fully performed.

6. SAME—COMMISSIONS—TERMINATION—COMPLETED BUSINESS.

Under sales engineer's contract with defendant die makers providing for termination at will and for commissions on ''net business which it obtains, * * * accepts, completes delivery on, invoices and receives payment therefor,'' plaintiff *held,* entitled to commissions not only on such business as he had procured that had been completed and paid for before termination but also on orders in process of fulfillment upon termination, which orders were afterwards completed and paid for.

7. SAME—CONSTRUCTION—AMBIGUITY.

Any ambiguity in a contract is to be resolved against the party for whom it had been drafted by an attorney.

8. SAME—CONSTRUCTION—SURROUNDING CONDITIONS AND CIRCUMSTANCES.

So far as practicable or legally possible, in construing a contract each and all of its provisions should be given effect; and if there is doubt as to the meaning, the conditions and circumstances surrounding the contracting parties and the subject matter with which they are dealing may be considered in arriving at a just construction.

9. SAME—CONSTRUCTION—AMBIGUITIES.

In interpreting doubtful agreements a court will, if possible, attach a sufficiently definite meaning to a bargain of parties who evidently intended to enter into a binding contract and ambiguous words therein should be interpreted most strongly against the party who used them.

10. WITNESSES—COMPETENCY—SPECIAL RECORD.

Where testimony of a witness, placed in a special record, related to figures taken from records of a corporation by some one other than the witness, the special record was properly excluded from consideration by trial judge in determining amount due in action of assumpsit for commissions, in absence of verification of figures by another witness as promised.

11. APPEAL AND ERROR—FINDING OF COURT—EVIDENCE—COMMISSIONS.

In sales engineer's action of assumpsit against die makers for balance due for commissions under terminated contract, trial judge's finding, after waiver of jury, that $18,728.68 was due plaintiff for commissions and interest, *held*, not against the great weight of the evidence.

12. COSTS—DENIAL OF RELIEF ON APPEAL.

No costs are awarded either party on appeal where judgment from which both parties appealed is affirmed.

Appeal from Wayne; Maher (Thomas F.), J. Submitted October 7, 1947. (Docket No. 3, Calendar No. 43,659.) Decided February 16, 1948. Rehearing denied April 5, 1948.

Assumpsit by Harry Gee against Albert Olson and another, individually and as copartners doing business as Odel Tool & Die Company, to recover

sales commissions. Cross declaration by defendants against plaintiff to recover amount of commissions paid in excess of the amount earned. Judgment for plaintiff. Defendants appeal. Plaintiff cross-appeals. Affirmed.

*George W. Bixler,* for plaintiff.

*John F. Langs,* for defendants.

REID, J. This is an action in assumpsit in which plaintiff seeks to recover for commissions for procuring orders for defendants for manufacturing war materials, which commissions plaintiff claims he earned but which were not paid him. Defendants filed a cross declaration to recover for claimed overpayment of commissions, which overpayment defendants allege is recoverable under their contract of employment with plaintiff because of renegotiation refunds agreed on by defendants with the United States government.

The trial began before a jury but the jury was waived after a considerable portion of the testimony had been taken. The trial then proceeded before the court without a jury. Plaintiff had judgment. Defendants appealed and plaintiff took a cross appeal.

Defendants Albert Olson and Fred Wiswedel, as partners doing business under the registered name of Odel Tool & Die Company, at 8820 Grinnell avenue, Detroit, were engaged in manufacturing diecast dies, plastic molds and other related work. Plaintiff had had long experience in sales engineering and management of production shops. He engaged to work for defendants as sales engineer, production manager and business advisor and began that employment early in February, 1942, under an oral agreement by which plaintiff was to receive 5

per cent. commission on production work and 10 per cent. commission on fixture work. An agreement for plaintiff's employment, exhibit No. 1, dated November 1, 1942, was prepared by attorney Jarl Andeer in January, 1943, and was signed but this agreement was later displaced by exhibits Nos. 9 and 10, both actually signed in October, 1943. Exhibit No. 9 was made to relate back to and is dated as of February 10, 1942. Later exhibit No. 22 was prepared and signed on January 27, 1944, modifying the preceding contract of employment. Exhibit No. 9 covered the period of employment, February 10, 1942 to January 1, 1943, and the parties had no agreement during that period respecting refunds of commissions on the basis of a renegotiation of prices. Exhibit No. 10, as modified by exhibit No. 22, covered the period of employment, January 1, 1943, to and including September 5, 1944, the date of termination of employment. The three exhibits are as follows:

### Exhibit No. 9

"Telephone: Plaza 9831

ODEL TOOL & DIE COMPANY
8820 Grinnell Avenue
Detroit 13, Mich.

"February 10, 1942

"Mr. Harry Gee
"710 Barrington Road
"Grosse Pointe Park,
"Michigan
"*Dear Sir:*

"You have informed us that you have been engaged in the representation of manufacturing concerns in the Detroit metropolitan area for many years, as your business.

"You also inform us that you are sufficiently qualified to not only represent this company in a sales capacity, but also in an engineering capacity,

to handle complaints, to work out details with customers and perform administrative and technical work in connection with the business which you obtain, and also in connection with other business. which we may have.

"We are prepared to offer you, therefore, an employment arrangement with the company of 5 per cent. upon the business which you obtain for the company, and to pay to you as a drawing account against your commissions, such sums as we may agree upon from time to time, but not in excess of your sales commissions,—it being understood that you will perform such administrative and technical services and such others duties as we may assign to you.

"It is further to be understood that this agreement shall terminate January 1, 1943, unless terminated at an earlier date by either party, it being understood that this contract shall be terminable at the will of either party and that at the time of termination an adjustment shall be made of all moneys which shall be due and owing by the company to you as of the date of termination and settlement shall be made in full as of that date and this agreement cancelled.

"It is further understood that the company will pay commissions to you only on the business which the company accepts, completes delivery on, and invoices for, less any credits or other deductions allowed on said business, being the intent that the commission shall be paid on the net business received. The company reserves the right to accept or reject any business you may obtain for its consideration.

"Very truly yours,
ODEL TOOL & DIE COMPANY,
By FRED WISWEDEL,
ALBERT OLSON.

"I accept the foregoing terms of employment.

HARRY GEE"

Exhibit No. 10

"ODEL TOOL & DIE COMPANY
"8820 Grinnell Avenue
"Detroit 13, Mich.

.      "January 2, 1943

"Mr. Harry Gee
"710 Barrington Road
"Grosse Pointe Park,
"Michigan

"*Dear Sir:*      .

"Based upon your services performed for the company during the year 1942, and your ability to represent the company in not only a sales capacity, but an engineering capacity and also technical and administrative capacity in connection with work which you have obtained for the company, and also in connection with other work of the company which has been assigned to you, we are prepared to offer you an arrangement with the company whereby the company will pay to you 5 per cent. upon the business which you obtain for the company and to pay to you as a drawing account against your commissions, such sums as we may agree upon from time to time, but not in excess of your sales commission,—it being understood that you will perform such administrative and technical services and such other duties as we may assign to you.

"It is further understood that this agreement shall be terminable at the will of either party at which time an adjustment shall be made of all moneys which shall be due and owing by the company to you as of the time of termination, and this agreement shall be cancelled,—it being intended that commissions will be figured up to the date of termination.

"It is further understood that as a part of this arrangement the company will pay commissions to you only upon the net business which it obtains, that is, which it accepts, completes delivery on, in-

voices and receives payment therefor, less any deductions for returns, credits, et cetera.

"It is further understood and agreed that if for any reason the sale price upon any business brought to this company by yourself should be reduced by any act of the United States government or any branch, agency or bureau thereof, that the commissions or other moneys due and owing by the company to you will be adjusted accordingly, and, further, that this agreement shall be subject to any rules or regulations adopted by either Federal or State governments pertaining to the payment of salaries, wages, commissions or any other form of compensation.

"Very truly yours,
ODEL TOOL & DIE COMPANY,
By s/ FRED WISWEDEL,
s/ ALBERT OLSON.

"I accept the foregoing terms
of employment.
s/ HARRY GEE"

Exhibit No. 22

"Detroit, Michigan
"January 27, 1944

"Messrs. Fred Wiswedel and
"Albert Olson
"Detroit, Michigan

"*Gentlemen:*

"Confirming our conversation of today in reference to the terms of my contract with you under date of January 2, 1943, wherein I am acting as your sales engineer on a percentage basis, it is agreeable to me that if for any legal reason you should find that my commissions are not allowed in full as items of expense, that we will make an equitable adjustment in accordance with such disallowance.

"It is my further understanding that if the government should attempt to disallow what you pay me, that you will notify me immediately so that I can defend the same as a valid item of expense.

"Yours very truly,
"HARRY GEE

"Confirmation Correct—

"FRED WISWEDEL

"ALBERT OLSON"

Defendants in their brief urge that they were justified in terminating the contract in question because of plaintiff Gee's contemporaneous acceptance of additional employment from other manufacturers. Defendants' attorney Langs, who drafted the two contracts, exhibits Nos. 9 and 10, testified that it was understood that Gee's employment was to be exclusive. It is, however, to be noted that there was no provision to such effect incorporated in the contracts. Gee, in his testimony, denies that his employment was to be exclusive but in effect says he tried to please defendants by terminating his other employments as rapidly as he fairly could do so. Defendants had the absolute right, even arbitrarily, to terminate plaintiff's employment (which they did on September 5, 1944).

All the orders obtained by defendants from Briggs Manufacturing Company during the period covered by plaintiff's employment were obtained by plaintiff. The commissions claimed by plaintiff are only for the orders obtained from Briggs Manufacturing Company.

The questions for us to determine are: First, are defendants entitled under the circumstances of this case to recover for alleged overpayment of commissions on prices readjusted by the renegotiation refund agreements with the Federal government? *

* See renegotiation act, 50 USCA App. § 1191, 50 F. C. A. App. 31.

Second, is plaintiff entitled to commissions on orders procured by him, which orders stood as cancelled on September 5, 1944, the date of the termination of plaintiff's employment, but which orders were later reinstated and fully carried out? Third, is plaintiff entitled to commissions on orders in process of fulfillment on September 5, 1944, which orders were afterwards completed and paid for?

We are obliged to determine this controversy on the construction we make of the contract and agreements between the parties. The cases cited by the parties contain no contract of the same import as the contract here involved; consequently, such decisions are not of controlling importance in deciding the case at bar.

Under the heading, first as to effect of renegotiation on the commissions, we have noted above that exhibit No. 9, covering the period, February 10, 1942 to December 31, 1942, inclusive, contains no provision for adjustment of Gee's commissions to a renegotiated price basis, and defendants can recover nothing because of renegotiation of prices for that period. However, exhibit No. 10 does contain a provision for adjustment of Gee's commissions to a basis of renegotiated prices under certain circumstances. Agreements for renegotiation of prices for 1943 and 1944 were made by defendants with the Federal government several months after defendants terminated Gee's employment. Plaintiff claims that the renegotiation agreements were in fact agreements for excess profits refunds and did not amount to renegotiation of sales prices. Plaintiff was not consulted in the making of the agreements with the government.

Defendants claim they were not required by their contracts to admit plaintiff Gee to the conferences on renegotiation. Exhibit No. 22, *supra,* contains a clause providing that if the government should

attempt to disallow what defendants pay plaintiff, defendants were to notify plaintiff immediately, so that he could defend the validity of his commissions. The renegotiations would under defendants' theory undermine the validity of plaintiff's commissions in part at least. It should be noted that the contracts did not expressly authorize defendants to cancel by agreement with the government ,any part of the rights of Gee to commissions computed on the original prices.

The defendants in several respects by their actions indicated a practical construction of exhibit No. 10, their agreement with plaintiff, and showed what they had in view as respects their own rights as to readjustment based on renegotiation, as follows:

1. Defendants did not at any time set up in their books any item of debit against plaintiff for refunds or deductions from commissions resulting from renegotiation.

2. Defendants did not by credit on account or otherwise actually pay Briggs Manufacturing Company for renegotiated price reductions for the years 1943 and 1944 (although a refund for $53,000 was made to Briggs for 1942). The renegotiation agreements did not require such payment to Briggs, although they expressed certain price reductions, which, however, were also recited as "additional profits which should be eliminated." The renegotiation agreements merely required that the amount of the excess profits agreed upon should be paid direct to the Federal government.

3. The renegotiations agreed on by defendants were for lump sums, including profits on orders not obtained by plaintiff. The renegotiation agreements did not specify what particular contract or contracts were renegotiated nor the amount of reduction of

price in any particular contract or contracts. Plaintiff was thus left without any means of knowing or showing whether other business which he did not procure was more profitable than business procured by him and that therefore the decrease in prices through the renegotiation might be due partly, principally or entirely to excessive profits from business with which plaintiff was not concerned.

4. Defendants represented to the government that plaintiff's commissions were correct, and the government took no step at any time insofar as the record discloses to bring about a direct reduction in the amount of commissions to plaintiff and defendants seem to have taken credit in their renegotiation agreements for the full amount of Gee's commissions without any reduction for renegotiation.

The finding of the trial judge was to the effect that under the facts of this case plaintiff is not bound to adjust his commissions on a basis of renegotiated prices. We affirm that finding.

With regard to question two, there was testimony that there were contracts obtained by plaintiff before September 5, 1944, which were cancelled prior to September 5, 1944, and renewed after that date. Plaintiff claims an additional amount should be added to the judgment for 5 per cent. on such items, or a total of $2,774.20 for such additional commissions. However, there is a showing in the record somewhat explanatory to the requirements expressly recited in exhibit No. 10, to the effect that an employee in the position of plaintiff was required to satisfy, if possible, complaints of customers. This he could not do on orders that stood cancelled as of September 5, 1944, because the complaints if any would necessarily come after shipment of the goods and plaintiff was then no longer in defendants' employment, so that he would be unable to complete

his work for defendants as to such reinstated business. The trial court found against plaintiff, on those items that were in a state of cancellation on September 5, 1944, but later reinstated, which finding we affirm.

The third question involves commissions due Gee on the orders at hand or in process of completion which were uncancelled on September 5, 1944, but afterwards were completed, goods accepted and actually paid for. The commissions for such orders were included in a judgment for $18,728.68, in which judgment was also included the balance of commissions on orders for goods which had been fully manufactured, accepted and paid for by Briggs Manufacturing Company before September 5, 1944. The two classifications of orders were grouped together and the following is the method by which the amount of the judgment was arrived at. When the testimony was nearly all taken the court had disallowed defendants' claim as to reduction for renegotiated prices and had also disallowed plaintiff's claim for commissions on orders taken but which were in a state of cancellation on September 5, 1944. There seems to have been at the close of testimony discussion not shown in the record regarding research of the records of defendants by accountants. The court had announced that the computation of plaintiff's commissions was to include not only all orders completely fulfilled and paid for by Briggs Manufacturing Company before September 5, 1944, but also all orders that were in process of manufacture or fulfillment for Briggs Manufacturing Company on September 5, 1944, but later fulfilled, accepted and paid for by Briggs Manufacturing Company. The court directed the accountants to make a computation upon such basis. The result of such resurvey of the books of Odel Tool & Die Company was an-

nounced by defendants' witness Colten, and it was agreed on that the amount, including interest, under the aforesaid rulings of the court, was $18,728.68.

In his finding the trial court stated his rulings more formally as follows:

"The court further finds that the plaintiff is entitled to commissions on such business as was in process and orders on hand as of September 5, 1944, which the defendants had obtained and/or received from the Briggs Manufacturing Company."

The record is barren of any showing that any of the items that were in process of manufacture and orders that were being filled on September 5, 1944, were complained about in any way or required any further attention on the part of plaintiff Gee, but on the contrary there is testimony that there were no further acts to be performed by Gee respecting such orders. We may assume therefore that as respecting those items then in process of being filled that Gee had fully performed all the services that his contract required of him.

The amount, $18,728.68, is therefore to be considered as the sum (interest included) of the unpaid commissions on orders fully completed and paid for by Briggs Manufacturing Company before September 5, 1944, plus orders in process of completion on September 5, 1944, but afterwards fully completed and paid for by Briggs Manufacturing Company. The other orders which stood as cancelled on September 5, 1944, but were afterwards reinstated and completed, were rejected by the court, as we have heretofore shown.

We consider the finding of the trial court to be a fair interpretation and construction to be placed on exhibit No. 10. It is to be noted that in the second paragraph of exhibit No. 10 the agreement speaks

of "an adjustment" at the time of the termination of the contract. The adjustment is to be made of all moneys which shall be due and owing by the company to plaintiff as of the time of termination, and in the same paragraph it is further recited that commissions will be figured up to the date of termination. It is to be observed that the contract does not speak of this adjustment as a final adjustment but merely *an* adjustment, and in the third paragraph of the same exhibit No. 10 the agreement recites that the company will pay commissions upon the net business which it accepts, completes delivery on, invoices and receives payment therefor, less deductions, et cetera, which indicates basis and method of computation as on total net production rather than production completed at the time of termination of contract. The second paragraph provides for termination of the contract and an adjustment of such commissions due plaintiff for work performed up to that time, whereas the third paragraph prescribes a method and basis for determining the amount of such commissions, namely, upon net business as distinguished from gross business. The third paragraph does not exclude compensation to plaintiff for orders received, accepted and in process of fulfillment at the termination of contract on which no further work needed to be done by plaintiff. As before noted, the contract was drafted by Mr. Langs, the attorney for defendants. Any ambiguity therein is to be resolved against the defendants. We consider that the third paragraph sets forth the basis and method of computation of plaintiff's commissions.

We said in the case of *Milligan* v. *Haggerty*, 296 Mich. 62, 69:

"So far as practicable or legally possible, in construing a contract each and all of its provisions should be given effect; and if there is doubt as to the

meaning, the conditions and circumstances surrounding the contracting parties and the subject matter with which they are dealing may be considered in arriving at a just construction.''

In *Nichols* v. *Seaks,* 296 Mich. 154, 159, this Court cited with approval 1 Williston on Contracts (Rev. Ed.), § 37, p. 100, as follows:

''In interpreting doubtful agreements a court will, if possible, attach a sufficiently definite meaning to a bargain of parties who evidently intended to enter into a binding contract and ambiguous words in an obligation should be interpreted most strongly against the party who used them.''

Plaintiff seeks to overturn the finding of the trial court as to the total amount of business obtained from Briggs Manufacturing Company for defendants, and plaintiff considers erroneous the refusal of the court to consider figures given by witness Jenuwin. Mr. Jenuwin seems to have been an employee of Briggs Manufacturing Company. He testified he was ''in charge of records, et cetera, at the Briggs Manufacturing Company,'' and he was asked concerning certain figures obtained from Briggs Manufacturing Company's records but this witness did not himself take the figures from the records and says attorney Stone furnished the figures. The testimony of Jenuwin was taken in a special record with the understanding the figures would be verified by another witness later. Such verification was not furnished and the trial court properly refused to consider the testimony of Jenuwin which appears in the special record.

While the testimony of Jenuwin as to the total business procured by plaintiff is incompetent testimony and cannot be used as a basis for the judgment, yet the testimony of plaintiff Gee that the

amount is "approximately $2,000,000" was given without objection to its competency, and plaintiff was not cross-examined as to the source or means of his knowledge. Under all the circumstances, including announcement of accountants' computation by Colten, we determine that the finding of $18,728.68 as due plaintiff is not against the great weight of the evidence.

The judgment appealed from is affirmed. This involves a denial of the relief sought by plaintiff as cross appellant as well as being an affirmance of the judgment appealed from by defendants. No costs are awarded to either party.

BUSHNELL, C. J., and SHARPE, BOYLES, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.